THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No: |
| | ) | |
| $92,020.00 IN U.S. CURRENCY, | ) | |
| | ) | |
| Defendant. | ) | |

**VERIFIED COMPLAINT FOR FORFEITURE**

NOW COMES the Plaintiff, the United States of America, by John D. Hoelzer, Assistant United States Attorney, and respectfully states as follows:

**Nature of the Action**

1. This is an action *in rem* to enforce the provisions of 21 U.S.C. § 881(a)(6) for the forfeiture of $92,020.00 in U.S. currency, which constitutes (1) moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act (21 U.S.C. § 801, *et seq.*); (2) proceeds traceable to such an exchange; (3) moneys, negotiable instruments, and securities used or intended to be used to facilitate a violation of the Controlled Substances Act; or (4) property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (money laundering), and is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

1

**The Defendant *In Rem***

2. The defendant is $92,020.00 in U.S. currency.

3. The defendant is currently in the custody of the United States.

**Jurisdiction and Venue**

4. This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5. Pursuant to 28 U.S.C. § 1355(b)(1)(A), this Court has *in rem* jurisdiction over the defendant and venue is proper in this district because the facts which give rise to this forfeiture occurred in Sangamon County, Illinois.

**Basis for Forfeiture**

6. The defendant is subject to forfeiture pursuant 21 U.S.C. § 881(a)(6) because it constitutes (1) moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act (21 U.S.C. § 801, *et seq*.); (2) proceeds traceable to such an exchange; (3) moneys, negotiable instruments, and securities used or intended to be used to facilitate a violation of the Controlled Substances Act; or (4) property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (money laundering).

**Facts**

7.       On September 29, 2021, law enforcement initiated a traffic stop on a black BMW on Interstate 55 at milepost marker 87. Law enforcement approached the BMW and Robert Thurman (Thurman) provided a Florida driver's license. When the officer requested his insurance card, Thurman advised the BMW was rented by his girlfriend (a search revealed that registration number FP93205 was from Enterprise Rent-A-Car), and could not provide a rental agreement. Thurman was asked who tinted the windows in the BMW. In response, Thurman advised that he had the windows tinted. Based on training and experience, law enforcement is aware that rental car companies do not tint windows in their rental vehicles.

8.       During the traffic stop, the officer could smell both raw and burnt cannabis coming from inside Thurman's vehicle, so the officer requested that Thurman come to his squad car. As Thurman and the officer proceeded to the squad car, Thurman asked why he was requested in the squad car. The officer responded that it was due to the raw and burnt cannabis odors coming from inside the vehicle. Thurman told the officer that he smoked cannabis before he left East St. Louis, Illinois. Law enforcement asked Thurman if there was anything illegal inside the car, and Thurman admitted to the officer that there was cannabis. When asked about his travel plans, Thurman reported that he resided in Miami, Florida, but had been staying with family

**Facts**

7.       On September 29, 2021, law enforcement initiated a traffic stop on a black BMW on Interstate 55 at milepost marker 87. Law enforcement approached the BMW and Robert Thurman (Thurman) provided a Florida driver's license. When the officer requested his insurance card, Thurman advised the BMW was rented by his girlfriend (a search revealed that registration number FP93205 was from Enterprise Rent-A-Car), and could not provide a rental agreement. Thurman was asked who tinted the windows in the BMW. In response, Thurman advised that he had the windows tinted. Based on training and experience, law enforcement is aware that rental car companies do not tint windows in their rental vehicles.

8.       During the traffic stop, the officer could smell both raw and burnt cannabis coming from inside Thurman's vehicle, so the officer requested that Thurman come to his squad car. As Thurman and the officer proceeded to the squad car, Thurman asked why he was requested in the squad car. The officer responded that it was due to the raw and burnt cannabis odors coming from inside the vehicle. Thurman told the officer that he smoked cannabis before he left East St. Louis, Illinois. Law enforcement asked Thurman if there was anything illegal inside the car, and Thurman admitted to the officer that there was cannabis. When asked about his travel plans, Thurman reported that he resided in Miami, Florida, but had been staying with family

in the East St. Louis area for the past two weeks prior to traveling to Chicago that day.

9. Thurman's vehicle was transported to the Illinois State Police (ISP) Academy for law enforcement to conduct a more thorough search of the vehicle. During a search of the vehicle, agents discovered approximately 57.8 grams of cannabis from inside a brown backpack in the backseat. A search of the trunk revealed several rubber banded bundles in $1,000.00 increments inside a pink Louis Vuitton duffle bag, which totaled $92,020.00 in U.S. currency, and several pieces of jewelry in a cloth jewelry roll. When asked about the jewelry, Thurman said some of it was "real" and some was costume jewelry. When asked about the cash found in the trunk, Thurman first reported there was $40,000.00 and then changed the amount to $57,000.00. Thurman advised he was a rapper and that the money belonged to him.

10. A further search of the vehicle revealed that the bar code stickers, which are placed on the windows of rental cars, had been removed. Based on training and experience, law enforcement is aware that drug smugglers or traffickers will often remove the bar code stickers in order to blend in with the general motoring public and not bring attention to themselves. Thurman was issued a warning for failure to wear a seatbelt, illegal transportation of cannabis, and illegal window tinting.

11. Thurman was read his constitutional rights and indicated to agents that he understood those rights. Thurman was questioned again about his travel plans. In response, Thurman told agents that he was traveling to Chicago and planned to stay at

the Trump Hotel for a few days. When questioned about hotel reservations, Thurman indicated that he did not have any reservations in Chicago. When questioned about the absence of luggage in the vehicle and what he planned on wearing, Thurman told law enforcement that he planned to buy clothes and jewelry when he arrived in Chicago.

12. When questioned about his employment, Thurman reported that he was a music producer and manager for aspiring rap recording artists. Thurman said he planned to possibly do a "feature" (rap music recording) in Chicago, which would pay him as little as $4,000.00 or as much as $15,000.00 depending on how he feels.

13. When asked if he had a recording studio, videographer, or other individuals in the music industry previously set up to produce the "feature" while he was in Chicago, Thurman told agents he did not. Thurman told agents that his last show was at the Halftime Bar and Grill in St. Louis, Missouri, on either May 12 or May 13, 2021, and that he had not had a show in a while due to Covid-19 pandemic. Thurman stated that he would be paid between $10,000.00 and $20,000.00 per show. When asked how often he did a "feature," Thurman stated that it was almost every other day, although he could not remember the three recent features he just did or how much he was paid for each one.

14. When questioned about his taxes, Thurman reported to agents that he paid taxes and that "Tax Man Jason" prepared his tax returns in St. Louis. Thurman admitted to agents that he claimed less money on his taxes than he earned from time to time, but did not want to get caught up in an investigation for failing to pay taxes.

15. Thurman was questioned again about the amount of cash in the vehicle. Thurman stated it was between $67,000.00 and $70,000.00. Thurman also stated he had been withdrawing it from his Bank of America account over the past few months, and that the cash were proceeds from his business.   At that time, Thurman provided agents with documents from the Missouri Secretary of State for "Professional Level Entertainment LLC" along with his Bank of America account number.

16. Agents conducted an open air sniff of the defendant currency utilizing "Kain," a trained and certified narcotic detection canine with the ISP. Agents placed the defendant currency in one of three brown cardboard boxes. The other two boxes were empty. Once the boxes were positioned in a row, Kain was brought into the ISP Academy room. As Kain was deployed, he made a positive alert to illegal drugs in the box containing the defendant currency.

17. A search of Thurman's criminal history revealed convictions for aggravated fleeing/bodily injury, resisting a peace officer, manufacture/delivery of cannabis (30-500 grams), and unlawful use of a weapon.

18.     Records received from Enterprise Rent-A-Car revealed that the BMW driven by Thurman was rented by Azizah Badwan (Badwan) at the St. Louis International Airport from September 8, 2021 to October 6, 2021. During that time, Badwan paid $2,567.42 for the rental fee, and the BMW incurred 2,346 miles.

19.     Based on the detailed facts above, which support a reasonable belief that the government will be able to meet its burden of proof at trial, the defendant is subject to forfeiture pursuant 21 U.S.C. § 881(a)(6) because it constitutes (1) moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act (21 U.S.C. § 801, *et seq.*); (2) proceeds traceable to such an exchange; (3) moneys, negotiable instruments, and securities used or intended to be used to facilitate a violation of the Controlled Substances Act; or (4) property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 (money laundering), and is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, the United States of America prays that this Court enter an order forfeiting the defendant to the United States of America for disposition according to law, for the issuance of a warrant *in rem*, for costs of suit, and for such other relief as the Court may deem necessary.

Respectfully submitted,

GREGORY K. HARRIS
UNITED STATES ATTORNEY

By: /s/ John D. Hoelzer
John D. Hoelzer, IL Bar No. 6295098
Assistant United States Attorney
United States Attorney's Office
318 South Sixth Street
Springfield, IL 62701
Telephone: (217) 492-4450
Email: john.hoelzer@usdoj.gov

VERIFICATION

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct based on information and belief.

Executed on this 25 day of March, 2022.

                                            s/Russell Lehr

                                            Russell Lehr
                                            DEA Task Force Officer